**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-2049-16T3

STATE OF NEW JERSEY,

      Plaintiff-Respondent,

v.

TODD STATHUM, a/k/a
TODD PAESON,

      Defendant-Appellant.

_____

Argued December 4, 2018 – Decided February 4, 2019

Before Judges Rothstadt and Gilson.

On appeal from Superior Court of New Jersey, Law Division, Monmouth County, Indictment No. 14-07-1235.

Cody T. Mason, Assistant Deputy Public Defender, argued the cause for appellant (Joseph E. Krakora, Public Defender, attorney; Cody T. Mason, of counsel and on the brief).

Lisa Sarnoff Gochman, Legal Assistant, argued the cause for respondent (Christopher J. Gramiccioni, Monmouth County Prosecutor, attorney; Lisa Sarnoff Gochman, of counsel and on the brief).

Appellant filed a pro se supplemental brief.

PER CURIAM

Defendant Todd Stathum was indicted for four crimes related to the robberies of two convenience stores. A jury convicted defendant of first-degree armed robbery, N.J.S.A. 2C:15-1, and fourth-degree possession of an imitation weapon for an unlawful purpose, N.J.S.A. 2C:39-4(e), in connection with the robbery of one of the stores. The jury deadlocked on those same charges in connection with the robbery of the other store. Thereafter, however, defendant pled guilty to the charges related to the other store, with an agreement from the State that it would recommend concurrent sentences.

Defendant was then sentenced to an extended term of twenty years in prison for the jury conviction of the first-degree armed robbery. He was also sentenced to a concurrent term of ten years in prison for the conviction of first-degree armed robbery based on his plea of guilty. Both of those sentences were subject to mandatory periods of parole ineligibility and parole supervision as prescribed by the No Early Release Act (NERA), N.J.S.A. 2C:43-7.2. On the convictions for possession of an imitation gun for an unlawful purpose, defendant was sentenced to concurrent terms of eighteen months in prison. Finally, defendant was ordered to pay $1330 in fines and penalties.

Defendant appeals his convictions and sentences, and argues (1) the counts concerning the two robberies should have been severed and tried separately; (2) it was improper to admit certain bad-act evidence against him without a proper limiting instruction; (3) he was entitled to a mistrial because, during trial, the State turned over a recording between a detective and a witness that defendant contends was exculpatory; (4) there were cumulative errors warranting a new trial; and (5) his sentences for the weapons offenses should have merged with the robbery convictions and the matter needs to be remanded for resentencing. We reject the first four arguments and affirm his convictions. We remand for resentencing so that the weapons offenses can be merged with the robbery convictions. We also remand for an ability-to-pay hearing on the discretionary fines and penalties.

I.

The charges against defendant involve two robberies that occurred on March 22, 2014, and April 1, 2014, in Long Branch. The first robbery occurred at the Monmouth Gas convenience store (the Monmouth Gas robbery) and the second robbery was at the LaCita convenience store (the LaCita robbery). We take the facts as developed in the record, including the evidence presented at trial.

A-2049-16T3

Just after noon on March 22, 2014, a man wearing a black hooded sweatshirt and ski mask entered the Monmouth Gas store. He approached the cashier, T.W.,[1] showed him a silver gun, and demanded money. T.W. complied and gave the man approximately $400 in cash, which was placed in a bag the man had brought with him.

The robber then fled. As he was running from the Monmouth Gas store, a local mail carrier saw him and noted the car he entered. At trial, the mail carrier was able to identify the car from surveillance videos that the police had obtained from a business near the Monmouth Gas store.

After the man left the store, T.W. called the store owner, who called the police. At trial, T.W. explained that he did not call the police because he did not want to be a "snitch." T.W. also later explained that he recognized defendant during the robbery, but did not immediately tell the police that he recognized defendant. In that regard, T.W. testified that he grew up with defendant and that he only told the police he recognized him when he heard that defendant was telling people he had set up the robbery.

Concerned that he might be arrested, T.W. called the police anonymously to identify defendant as the robber. A police detective recognized T.W.'s voice

---

[1] We use initials for witnesses to protect their privacy.

A-2049-16T3

as the anonymous caller, and then contacted T.W. to ask for a formal statement. T.W. complied and, on April 3, 2014, he gave a formal statement implicating defendant in the robbery. T.W. was also shown a photo array and identified defendant as the person who had robbed the Monmouth Gas store. At trial, T.W. again identified defendant as the robber.

As part of the investigation, the police also obtained video from a security camera in the Monmouth Gas store. That video showed the suspect as a man dressed in black with a ski mask, pointing a silver and black handgun towards T.W. and demanding money. Earlier footage from the security camera also showed that before the robbery, defendant and his brother purchased coffee at the Monmouth Gas store and that when they left the store, they entered a vehicle that matched the description given by the mail carrier. Other surveillance video showed the suspect fleeing after the robbery and entering a vehicle that matched the vehicle defendant and his brother were seen in earlier in the day.

As already noted, the LaCita robbery occurred on April 1, 2014. Shortly before 10 p.m., the robber entered the store wearing camouflage pants, a gray hooded sweatshirt, and a green bandana over his face. The robber then picked up a bag of popcorn, and approached the counter where a cashier was working. As the cashier was ringing up the charge for the popcorn, the robber pulled out

a gun and ordered the cashier to put all the money from the register into a plastic bag that the robber had brought.

When the robber left, the cashier called the police. Officers were able to secure video footage from inside the LaCita store and the video showed the suspect wearing clothes that matched the description given by the cashier. The video footage from the LaCita store also showed the suspect using a weapon that appeared to be the same weapon that had been used in the Monmouth Gas robbery. Further, other surveillance video showed a vehicle near LaCita at the time of the robbery that appeared to be the same vehicle used in the getaway from the Monmouth Gas robbery.

Defendant was arrested. After waiving his Miranda[2] rights, defendant admitted that he had committed both the Monmouth Gas and the LaCita robberies. He also confirmed what he wore during the LaCita robbery and told the police that the gun was an imitation gun and it could be located at his home. Thereafter, defendant signed a consent-to-search form and the police searched his home. They seized a number of items, including a silver and black imitation handgun, a dark gray hooded sweatshirt, camouflage pants, a green bandana,

---

[2] Miranda v. Arizona, 384 U.S. 436 (1966).

A-2049-16T3

and an empty bag of popcorn that matched the type of popcorn the robber had taken from the LaCita store.

During his statement, the police also questioned defendant concerning a robbery that occurred in Shrewsbury on March 22, 2014. Defendant repeatedly denied any involvement in the Shrewsbury robbery.

In July 2014, defendant was charged with two counts of first-degree armed robbery and two counts of fourth-degree possession of an imitation weapon for an unlawful purpose. Before trial, defendant filed a number of motions. He moved to suppress the evidence seized from his home, the statement he had given to the detectives, and T.W.'s out-of-court identification of him. Following an evidentiary hearing, the trial court denied those motions.

Defendant also filed a motion to sever the counts concerning the Monmouth Gas robbery from the counts concerning the LaCita robbery. After hearing oral argument, the trial court denied that motion. Citing Rule 3:15-1(a) and applying the four-prong test adopted by our Supreme Court in State v. Cofield, 127 N.J. 328, 338 (1992), the court found that severance was not warranted because evidence of the two robberies related to one another. In that regard, the court found that the robberies were part of a common scheme or plan because the suspect wore a hooded sweatshirt, appeared to use the same gun,

fled in the same vehicle, and the robberies occurred within a short distance of each other. The court also reasoned that the two robberies occurred within ten days of each other, which was reasonably close in time. The court then found that there was clear and convincing evidence for each of the robberies given defendant's confession, the witness statements, the video evidence, and the physical evidence recovered from defendant's home. Finally, the court found that the probative value of the other-crime evidence was not outweighed by any prejudice to defendant.

The State also filed a pretrial motion seeking permission to submit evidence concerning the Shrewsbury robbery. The State argued the evidence was necessary to give context to defendant's confessions and to rebut defendant's claim that those confessions were coerced and untrustworthy. In response to that motion, defense counsel submitted a letter stating that defendant would consent to the admission of sanitized evidence concerning the Shrewsbury robbery after receiving the related discovery.

The court asked for a consent order, but the order that was ultimately submitted did not contain the signatures of defendant or defense counsel. Nevertheless, the trial court entered that order and defense counsel did not object at the time that the order was entered. At trial, however, defense counsel

objected when the State sought to admit sanitized evidence concerning the Shrewsbury robbery. The court overruled that objection.

Thereafter, an eight-day trial was conducted in July 2016. The State called a number of witnesses, including T.W. and the cashier from the LaCita store. The State also called several members of the Long Branch Police Department. Defendant elected not to testify and only called one witness at trial, the owner of the Monmouth Gas store.

Before trial, the defense had made several discovery requests for all recorded conversations between detectives and T.W. The State had produced one recorded "anonymous" call, which detectives believed came from T.W. During trial, however, it became evident that the State failed to produce a separate recorded conversation between a police detective and T.W. That conversation took place prior to T.W.'s formal recorded statement to the police.

Defendant moved for a mistrial. The court conducted a Rule 104 hearing outside the presence of the jury and the detective involved in the conversation testified. See N.J.R.E. 104. The court also ordered the State to locate and turn over the recording, and all parties had an opportunity to review it and it was played at the Rule 104 hearing.

Defendant argued that the recording contained statements that were inconsistent with testimony by T.W. and the detective, and the late disclosure deprived him of a fair trial. The trial court rejected those arguments, finding the recording was not exculpatory and that the statements made by T.W. were consistent with his identification of defendant as the robber. The court went on to find that the recorded conversation did not present the type of exculpatory information that was likely to result in a manifest injustice. The court also found that the earlier disclosure of that recording would not have changed the defense strategy. Accordingly, the court denied defendant's motion for a mistrial, but held that the State was barred from using the recording in its case-in-chief, unless defense counsel chose to cross-examine the detective about the call.

After hearing all of the evidence, and after being given instructions, the jury deliberated for three days. On the second day of its deliberations, the jury reported that it was "hung." The court instructed the jury to continue deliberations using the model jury charge for jury deliberations. The following day, the jury returned guilty verdicts on the robbery and weapons charge related to the LaCita robbery, but reported that it was unable to reach verdicts on the charges related to the Monmouth Gas robbery.

10

Approximately three weeks after the jury verdict, defendant entered a conditional guilty plea to first-degree robbery and fourth-degree possession of an imitation weapon for an unlawful purpose in connection with the Monmouth Gas robbery. In exchange for that plea, the State recommended ten years in prison, subject to NERA, to run concurrent to the sentence imposed by the court on the convictions from the jury trial. Defendant reserved the right to withdraw his guilty plea in the event that his convictions by the jury were overturned on appeal.

In December 2016, defendant was sentenced. In aggregate, defendant was sentenced to twenty years in prison subject to NERA. Consistent with his plea agreement, the sentence included a concurrent ten-year sentence on the conviction for first-degree armed robbery to which defendant pled guilty. Defendant was also sentenced to concurrent terms of eighteen months in prison for both weapons offenses. Finally, as already noted, the court imposed $1330 in fines and penalties. Defendant now appeals from his convictions and sentences.

II.

On appeal, defendant makes five arguments, which he articulates as follows:

POINT I – STATHUM'S CONVICTIONS SHOULD BE REVERSED BECAUSE THE TRIAL COURT ABUSED ITS DISCRETION WHEN IT REFUSED TO SEVER THE MONMOUTH GAS OFFENSES FROM THE SEPARATE LACITA OFFENSES.

POINT II – THE TRIAL COURT COMMITTED REVERSIBLE ERROR WHEN IT ADMITTED EVIDENCE THAT STATHUM WAS SUSPECTED IN ANOTHER ARMED ROBBERY, USED HEROIN, OWED COURT FEES, AND WAS SUBJECT TO ARREST BASED ON THOSE FEES, AND DID SO WITHOUT ADEQUATE LIMITING INSTRUCTIONS.

    A. The Information About the Shrewsbury Robbery Was Irrelevant and Highly Prejudicial, Such That Its Admission Requires Reversal.

    B. Reversal Is Required Because the Evidence of Stathum's Drug Use and Court Fees Was Irrelevant and Highly Prejudicial, Particularly Given the Lack of Limiting Instructions.

POINT III – THE TRIAL COURT SHOULD HAVE GRANTED STATHUM'S REQUEST FOR A MISTRIAL BECAUSE THE STATE DID NOT DISCLOSE A RECORDING THAT CONTRADICTED KEY TESTIMONY AND RAISED QUESTIONS ABOUT [T.W.'S] IDENTIFICATION UNTIL MID-TRIAL.

POINT IV – THE CUMULATIVE EFFECT OF THE TRIAL ERRORS DEPRIVED STATHUM OF DUE PROCESS AND A FAIR TRIAL AND WARRANTS REVERSAL OF HIS CONVICTIONS.

A-2049-16T3

POINT V – A REMAND IS REQUIRED BECAUSE THE COURT ERRONEOUSLY DID NOT MERGE THE UNLAWFUL-PURPOSE FIREARM AND ROBBERY OFFENSES, AND DID NOT MAKE REQUIRED FINDINGS IN IMPOSING $700 IN FINES.

> A.   A Remand Is Required Because the Court Erred in Not Merging the Unlawful-Purpose Firearm Convictions With the Armed Robbery Convictions.
>
> B.   A Remand Is Required Because the Court Did Not Make Any Findings Regarding Stathum's Ability to Pay $700 in Discretionary Fines.

Defendant also submitted a pro se letter brief in which he supplements his argument concerning the late disclosure of the recording and he contends:

> THE DEFENDANT'S CONVICTION WAS OBTAINED [IN] VIOLATION OF DEFENDANT'S FOURTEENTH AMENDMENT DUE PROCESS RIGHT IN ARTICLE 1, PARAGRAPH 10 OF THE N.J. CONSTITUTION WHICH INSURES THAT A CRIMINAL DEFENDANT IS AFFORDED FULL DISCOVERY OF ALL EVIDENCE TO BE PRESENTED AGAINST HIM IN ACCORDANCE WITH RULE 3:13-3.

Having reviewed these arguments in light of the record and law, we affirm defendant's convictions, but remand for resentencing and an ability-to-pay hearing. We address each of defendant's five arguments in turn.

13                                              A-2049-16T3

A. The Motion to Sever

Defendant contends that the trial court's failure to sever the trials of the two robberies prejudiced his defense and deprived him of his rights to due process and a fair trial. We disagree.

Two or more offenses may be charged in the same indictment if the offenses "are of the same or similar character or are based on the same act or transaction or on [two] or more acts or transactions connected together or constituting parts of a common scheme or plan." R. 3:7-6. Trial courts have discretion to sever charges if "it appears that a defendant or the State [will be] prejudiced by a permissible or mandatory joinder of offenses or of defendants[.]" R. 3:15-2(b). In such circumstances, the trial court may order separate trials on certain counts of the indictment. Ibid. We review a trial court's severance ruling for an abuse of discretion. State v. Sterling, 215 N.J. 65, 73 (2013).

Severance should be granted if there is a danger that the jury could improperly use the evidence cumulatively. Our Supreme Court has explained that

> [t]he relief afforded by Rule 3:15-2(b) addresses the inherent "danger[,] when several crimes are tried together, that the jury may use the evidence cumulatively; that is, that, although so much as would

A-2049-16T3

be admissible upon any one of the charges might not have persuaded them of the accused's guilt, the sum of it will convince them as to all."

[Ibid. (second alteration in original) (quoting State v. Pitts, 116 N.J. 580, 601 (1989)).]

"The test for assessing prejudice is 'whether, assuming the charges were tried separately, evidence of the offenses sought to be severed would be admissible under [N.J.R.E. 404(b)] in the trial of the remaining charges.'" Ibid. (quoting State v. Chenique-Puey, 145 N.J. 334, 341 (1996) (alteration in original)). A defendant bears the burden of establishing prejudice. State v. Lado, 275 N.J. Super. 140, 149 (App. Div. 1994).

Under Rule 404(b), "evidence of other crimes, wrongs, or acts" is generally prohibited. See N.J.R.E. 404(b). If, however, such evidence is offered to prove "motive, opportunity, intent, preparation, plan, knowledge, identity or absence of mistake or accident," it is admissible if "relevant to a material issue in dispute." Ibid. To determine whether other-crimes evidence is admissible under Rule 404(b), courts use a four-part test:

> 1. The evidence of the other crime must be admissible as relevant to a material issue;
>
> 2. It must be similar in kind and reasonably close in time to the offense charged;

3. The evidence of the other crime must be clear and convincing; and

4. The probative value of the evidence must not be outweighed by its apparent prejudice.

[Cofield, 127 N.J. at 338.]

Here, the record establishes that evidence regarding each robbery was admissible and relevant to prove defendant's identity and use of a common scheme or plan. The trial court found that the robberies were carried out by a man who threatened the cashiers with a silver and black handgun, demanded money, wore a hooded sweatshirt and face covering to conceal his identity, and fled in a gray Hyundai. In addition, the robberies were committed within a short distance of each other. Given the numerous similarities between the Monmouth Gas and LaCita robberies, the trial court did not abuse its discretion in finding the two incidents were part of a common scheme or plan under Rule 3:7-6.

The trial court also found that (1) the robberies occurred ten days apart, which was reasonably close in time; (2) the robberies were similar in kind; (3) clear and convincing evidence of both robberies existed based on defendant's confessions, T.W.'s identification of defendant, the video evidence, and the physical evidence recovered from defendant's home; and (4) the probative value of the evidence was not outweighed by any apparent prejudice to defendant.

Those findings were supported by substantial, credible evidence in the record. Accordingly, the trial court did not abuse its discretion in denying defendant's severance motion.

### B. Other-Crimes Evidence

Next, defendant argues that the trial court committed reversible error by allowing the State to present defendant's statement to detectives, which included references to (1) the unindicted Shrewsbury robbery; (2) defendant's use of heroin; and (3) outstanding court fees that subjected defendant to arrest. Defendant argues there was no permissible basis to admit evidence of these "other crimes" and his statement should have been sanitized. Moreover, he contends that the trial court's failure to provide limiting instructions concerning his use of heroin and his outstanding court fees deprived him of a fair trial.

Again, we use an abuse-of-discretion standard to review whether the trial court correctly admitted these other-crimes and bad-acts evidence under Rule 404(b). See Cofield, 127 N.J. at 339-40. We find no abuse of discretion in the admission of these three references.

We first address the reference to the Shrewsbury robbery. Defendant gave a statement to police, wherein he confessed to the Monmouth Gas and LaCita robberies, but vehemently denied involvement in the Shrewsbury robbery. At

trial, the jury heard that portion of the statement. The court instructed the jury—on three occasions—that defendant was not charged with the Shrewsbury robbery and that they must not consider the Shrewsbury robbery in determining defendant's culpability for the Monmouth Gas and LaCita robberies. Moreover, since defendant denied his involvement in the Shrewsbury robbery, the discussion of that other robbery was not other-crime evidence against him. See State v. Figueroa, 358 N.J. Super. 317, 325-26 (App. Div. 2003) (explaining that admission of a defendant's statement, which involved discussions of unindicted crimes that the defendant denied involvement in, was not other-crimes evidence as to that defendant).

Furthermore, when the State first moved to admit the portion of defendant's statement referencing the Shrewsbury robbery, defense counsel consented to the admission of that part of the statement. Accordingly, defendant is barred from challenging the admissibility of the Shrewsbury reference under the doctrine of invited error. See State v. A.R., 213 N.J. 542, 561 (2013) ("[T]rial errors that 'were induced, encouraged or acquiesced in or consented to by defense counsel ordinarily are not a basis for reversal on appeal[.]'" (quoting State v. Corsaro, 107 N.J. 339, 345 (1987))).

A-2049-16T3

Defendant also asserts that the court committed reversible error by allowing the jury to hear portions of defendant's statement concerning his use of heroin and his unpaid court fees. In his recorded statement, defendant told detectives that he was high on heroin during the LaCita robbery, and that he set up the Monmouth Gas robbery to get money to satisfy unpaid court fees. Those portions of his statement were not redacted.

Defendant did not object to those portions of his statement at trial and, therefore, we review those admissions for plain error. R. 2:10-2. To constitute plain error, the evidence must have been "clearly capable of producing an unjust result." Ibid. As part of that analysis, we "consider the effect of any error in light 'of the overall strength of the State's case.'" State v. Baker, 400 N.J. Super. 28, 47 (App. Div. 2008) (quoting State v. Chapland, 187 N.J. 275, 289 (2006)).

Here, the jury convicted defendant of the LaCita robbery. The State's evidence concerning that robbery was strong. Those proofs included defendant's confession, surveillance video footage, the clothing worn by the robber (recovered from defendant's home), and the imitation handgun used in the robbery. Given the limited references to his use of heroin and unpaid court fees, we discern no plain error warranting the reversal of the jury verdict.

A-2049-16T3

C.    The Request for a Mistrial

Defendant claims the State's delayed disclosure of a recorded phone conversation between T.W. and a detective warranted a mistrial. He asserts that the trial court's denial of his motion compromised his right to a fair trial and requires reversal of his convictions. We disagree.

A mistrial should be granted "only to prevent an obvious failure of justice." State v. Harvey, 151 N.J. 117, 205 (1997) (citing State v. Rechtschaffer, 70 N.J. 395, 406 (1976)). Whether an event at trial justifies a mistrial is a decision "entrusted to the sound discretion of the trial court." Ibid. (citing State v. DiRienzo, 53 N.J. 360, 383 (1969)). We "will not disturb a trial court's ruling on a motion for a mistrial, absent an abuse of discretion that results in a manifest injustice." State v. Jackson, 211 N.J. 394, 407 (2012) (quoting Harvey, 151 N.J. at 205).

During trial, it came to light that there was an additional recorded statement between a detective and T.W. When the trial court learned of that situation, it conducted a Rule 104 hearing outside the presence of the jury. See N.J.R.E. 104.

20

The court also ordered the State to obtain and produce a copy of that recording, and the recording was played at the Rule 104 hearing. The transcript of the complete audio recording provides as follows:

[T.W.]: Hello.

[DETECTIVE]: Hello, [T.W.]?

[T.W.]: Yes.

[DETECTIVE]: How are you doing, sir? It's Detective Cahill, the Long Branch Police Department.

[T.W.]: What's up?

[DETECTIVE]: How are you doing, my friend? I was wondering, number one, I wanted to speak to you again about if you have some time today or tomorrow, but more importantly have you heard anything, anything on the street that you think might know what's going on?

[T.W.]: No, I haven't, but maybe if you guys got a better look at that tape you might see something.

[DETECTIVE]: What do you mean?

[T.W.]: Like during that day. Looked like I seen somebody that looks like him around like 10:00.

[DETECTIVE]: Do you think so?

[T.W.]: Well, like around 10 o'clock.

[DETECTIVE]: Okay.

A-2049-16T3

[T.W.]: You might want to look at the shoes, people walking in and out. You might see it.

[DETECTIVE]: You might see it. Do you think you saw it?

[T.W.]: I didn't see the shoes, but - -

[DETECTIVE]: You think you saw?

[T.W.]: Yeah.

[DETECTIVE]: And - - all right. All right. I appreciate that. And that's, you know, more of what I wanted to talk to you about. I know that you're a perceptive guy and we're dealing with that. You have no idea it took - - it's taken like eight hours to download that video because it's a very old system. The guy has it, so if you think 10 o'clock, in the 10 o'clock hour, I'll - - is there something you - - did you talk to [P.S.] about this?

[T.W.]: Huh?

[DETECTIVE]: Did you talk to [P.S.] about this?

[T.W.]: Um. . .

[DETECTIVE]: Your boss?

[T.W.]: No, no. I work with - - give you all a call yesterday, but sort of fucking shits. Man, I don't like this type of shit, but - -

[DETECTIVE]: Hey, I, I, I completely understand where you're coming from and I feel like today that, you know, you know a little bit more and I know you don't want to jump out and say it and I'm doing my best to

A-2049-16T3

figure it all out on my own, but every once in a while I need a little bit of help.

[T.W.]: All right. Around the 10:00 hour, like, he showed me, he showed me like a video. He asked me if it was a certain dude and I said, na, it wasn't him.

[DETECTIVE]: Who's that certain dude that you know it's not?

[T.W.]: Fucking W[.S.].

[DETECTIVE]: Okay.

[T.W.]: He was in there with somebody else.

[DETECTIVE]: Okay.

[T.W.]: And fuck him. He tried to play me the fuck out, so fuck him, too. So - -

[DETECTIVE]: Listen to me. We're - - if you - - listen. I'm very, very close to the brother of W[.S.], so if you think you can help me out any more, you know, just, there's other things you can tell me on the fly and it will help me out, keep [me] on the fly. All right?

[T.W.]: All right. Like I said, it was - - it wasn't W[.S.]

[DETECTIVE]: Okay.

[T.W.]: I know W[.S.], and I don't think W[.S.] would do nothing like that to me.

[DETECTIVE]: Yeah.

[T.W.]: But - -

23

[DETECTIVE]:  But his brother is a different story?

[T.W.]:  Like I said, you might want to - -

[DETECTIVE]:  Okay. I got you.  I got you.  I'm going to deal with that and just answer my call if I call you.  Okay?  I really appreciate it.

[T.W.]:  All right.

[DETECTIVE]:  Thank you, [T.W.]

[T.W.]:  All right.

[DETECTIVE]:  Bye.

[T.W.]:  Bye.

The trial court reasoned that the recording was not exculpatory because it actually reinforced T.W.'s identification of defendant.  The court also found that the recording bolstered the State's case and, therefore, it did not present the type of exculpatory evidence that was likely to favor the defense and result in a manifest injustice.  We discern no abuse of discretion in the trial court's reasoning and decision to deny the motion for a mistrial.

D.    The Alleged Cumulative Errors

Defendant contends that there were multiple errors at his trial, which in cumulative effect deprived him of due process and a fair trial.  The errors that defendant points to, however, are the errors concerning severance, the admission

of other-crime and bad-act evidence, and the denial of his motion for a mistrial. As we have already analyzed, none of those alleged errors have merit. Consequently, defendant has not demonstrated any prejudice and he has also failed to establish that he did not receive a fair trial. See State v. Weaver, 219 N.J. 131, 155 (2014) (explaining that the theory of cumulative error does not apply where no error was prejudicial and the trial was fair). Here, a review of the record establishes that defendant received a fair trial.

E.    The Sentence

Finally, defendant argues that his sentence was incorrect because the court failed to merge his convictions for possession of an imitation weapon for an unlawful purpose with his robbery convictions. Defendant also argues that he is entitled to an ability-to-pay hearing regarding the imposition of discretionary fines. The State agrees that a remand is necessary for both of those reasons.

We also agree that this matter must be remanded for resentencing. Under N.J.S.A. 2C:1-8(a), defendant's possession of an imitation firearm when he committed both robberies were elements of defendant's armed robbery convictions. Accordingly, his weapons convictions should have merged with his robbery convictions. See State v. Diaz, 144 N.J. 628, 641 (1996) (explaining

that when the proofs established that defendant's unlawful purpose was to use a gun against a victim of a robbery, merger was required).

Moreover, defendant was entitled to an ability-to-pay hearing concerning the imposition of discretionary fines. Here, the trial court imposed $700 in discretionary fines. In determining a defendant's ability to pay discretionary fines, "the court shall take into account the financial resources of the defendant and the nature of the burden that its payment will impose." N.J.S.A. 2C:44-2(c)(1); see also State v. Newman, 132 N.J. 159, 178-79 (1993). Here, the sentencing court failed to consider defendant's ability to pay the discretionary fines. Accordingly, we remand for resentencing and an ability-to-pay hearing.

Defendant's convictions are affirmed. His sentences are vacated and we remand for resentencing. We do not retain jurisdiction.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

26

A-2049-16T3